THE STATE OF OHIO, APPELLEE, *v*. JACKSON, APPELLANT.

[Cite as State *v*. Jackson (1991), 57 Ohio St. 3d 29.]

(No. 89-2128—Submitted October 17, 1990—Decided January 9, 1991.)

*John T. Corrigan,* prosecuting attorney, and *Christa D. Brunst,* for appellee.

*Thomas J. Wagner, Kelley & Gill* and *Thomas G. Kelley,* for appellant.

MOYER, C.J. We have reviewed Jackson's seventeen propositions of law, independently assessed the evidence relating to the death sentence, balanced the aggravating circumstance against possible mitigating factors, and evaluated the proportionality of the sentence to those imposed in similar cases. As a result, we affirm the convictions and sentence of death.

## I

### Exculpatory Evidence

In his first proposition of law, Jackson asserts the prosecution

violated his constitutional rights by failing to disclose crucial and material exculpatory evidence. The state argues that Jackson failed to prove suppression of material exculpatory evidence within the meaning of *Brady* v. *Maryland* (1963), 373 U.S. 83.

Just before the sentencing hearing, defense counsel discovered a twelve-year-old witness, Terrence Myrieckes, who testified at the hearing that he had stopped outside the laundromat around 11:15 or 11:30 a.m. on June 25. He looked in the laundromat's window, noticed the cash register was not in its normal place, and saw Zak, alone, standing near the bathroom door. Myrieckes saw a man other than Jackson, carrying a white duffel bag over his shoulder, walk out of the laundromat and place the bag in an automobile trunk. Myrieckes, who played basketball with Jackson, had earlier talked with the police, but had not told them about the duffel bag.

During their extensive investigation, police assigned three detective teams and interviewed hundreds of witnesses. Hence, Jackson does not argue the prosecutor personally knew about Myrieckes or directly suppressed his evidence. However, Jackson argues Myrieckes' testimony suggests someone other than Jackson committed the robbery. Jackson reasons that if the register was missing, this tends to prove that the robbery and murder were not connected.

In *State* v. *Johnston* (1988), 39 Ohio St. 3d 48, 529 N.E. 2d 898, we recognized that suppressing material evidence favorable to an accused violates due process regardless of the prosecutor's good or bad faith. See *Brady* v. *Maryland, supra.*

*State* v. *Johnston* further held that:

"In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. * * *" *Id.* at paragraph five of the syllabus.

The *Brady* test, applied in *State* v. *Johnston, supra,* is stringent. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States* v. *Agurs* (1976), 427 U.S. 97, 109-110; see *United States* v. *Bagley* (1985), 473 U.S. 667.

*Brady* requires a "reasonable probability" of a different outcome with the exculpatory evidence, that is, an undermined confidence in the trial result obtained without the exculpatory evidence. *United States* v. *Bagley, supra,* at 682. The defense must prove a *Brady* violation and denial of due process. *Talamante* v. *Romero* (C.A.10, 1980), 620 F. 2d 784; *Monroe* v. *Blackburn* (C.A.5, 1979), 607 F. 2d 148. See, also, *State* v. *Wickline* (1990), 50 Ohio St. 3d 114, 117, 552 N.E. 2d 913, 917.

In this case, there is no "reasonable probability" that the trial result would have been different. Confidence in the fairness of the trial is not undermined by Myrieckes' failure to testify in the guilt phase. The jury considered his testimony in sentencing, and it made no difference then. Myrieckes did see Zak alive after 11:00 a.m., but so did one of the laundromat patrons, who testified at trial. The fact that an unknown man left the laundromat, carrying a duffel bag, does not tend to prove he had a cash register in it. More crucially, standing outside and

looking into the laundromat, over the machines, and noticing if a cash register was missing would be very difficult, as the photographs and cross-examination proved.

Moreover, the evidence linked Jackson to both the robbery and the murder. Both the robbery and murder occurred within a short time. Jackson knew the register's location and the amount of money missing, and he admitted his fingerprints would be on the register. The register keys had been taken from Zak's body. Plastic bags in Jackson's apartment matched one found with the register, and Jackson was seen a few days after the murder carrying a plastic bag towards the wooded area where police found the register. Also, Jackson admitted complicity in the robbery. Neither logic nor other evidence supports Jackson's speculation that the robbery and murder were unrelated events or that Jackson may have killed Zak out of rage because Zak had not given him a refund two days earlier.

Additionally, the prosecution proved Jackson's guilt of the robbery and murder by abundant evidence: fingerprints, handwriting analysis, and his own admissions as well as circumstantial evidence. The jury chose to reject Jackson's testimony and that of three alibi witnesses; Myrieckes' testimony would have made no difference. As the United States Supreme Court said in *United States* v. *Agurs, supra,* at 112-113:

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. * * * This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. [Footnotes omitted.]"

## II
### Improper Interrogation

In his second proposition of law, Jackson argues that Police Captain Newkirk violated his *Miranda* rights and his right to counsel by questioning him after Jackson asked for an attorney. The state argues that even though a suspect has ended interrogation by requesting counsel, he may nonetheless reinitiate a police interview before counsel is provided.

On September 5, Detective Schafer advised Jackson of his *Miranda* rights, and Jackson said he wanted to think about it overnight before making a statement. On September 6, Schafer again advised Jackson of his rights. Jackson waived his rights and wrote out a statement. Then Jackson changed his mind, scratched his signature off the waiver, and said, "I better talk to a lawyer first." Schafer stopped questioning Jackson and returned him to his cell. Captain Newkirk was not present during this interview.

On September 7, Newkirk was working, but Detective Schafer was not. Around 5:00 p.m., right before quitting time on Labor Day, Newkirk received a jailer's message that Jackson wanted to see him. Newkirk did not know that Jackson had asked for an attorney the day before. Newkirk then talked with Jackson and advised him of his rights. According to Newkirk's typed notes of the meeting, which he read during his testimony, "Andre stated that he understood his rights and was willing to talk to me about 'this' but he did not want to sign the form or anything else." Jackson was worried about his mother's health and how she was to be told of his arrest. Jackson wanted his mother to be with Precious when his mother was told. Newkirk took notes during the interview and showed them to Jackson,

who agreed they were accurate; then the notes were typed into a memo. During the interview, Jackson, while admitting complicity in the robbery, tried to focus responsibility for the murder on an unnamed accomplice.

In *Edwards* v. *Arizona* (1981), 451 U.S. 477, the United States Supreme Court adopted a bright-line test about interrogation after an accused has asked for a lawyer.

"* * * [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation * * *. * * * [Such] an accused * * * is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-485.

*Oregon* v. *Bradshaw* (1983), 462 U.S. 1039, held that the *Edwards* rule was not violated when the accused reinitiated police interrogation if there was a subsequent knowing and intelligent waiver of counsel. In *State* v. *Van Hook* (1988), 39 Ohio St. 3d 256, 530 N.E. 2d 883, we found the *Edwards* rule satisfied by a knowing and intelligent waiver because Van Hook had reinitiated interrogation:

"A suspect who has ended interrogation by requesting the assistance of counsel may himself reinitiate the interrogation before counsel has been provided. * * *" *State* v. *Van Hook, supra,* paragraph two of the syllabus; see, also, *Smith* v. *Illinois* (1984), 469 U.S. 91; Annotation (1987), 83 L. Ed. 2d 1087.

Admittedly, Newkirk's ignorance of Jackson's prior request to see a lawyer does not satisfy the *Edwards* requirement. *Arizona* v. *Roberson* (1988), 486 U.S. 675, applied the *Edwards* rule even though the policeman who reinitiated interrogation did so in an unrelated investigation and did not know the suspect had previously requested counsel.

In this case, Jackson clearly understood his right not to talk to the police and exercised that right on September 5 and 6. However, on September 7, Jackson freely chose to send for Newkirk and start a conversation with him. Newkirk again advised Jackson fully of his rights, and Jackson said he understood them. Newkirk did not threaten or force Jackson to make any statement. Jackson wanted to talk about his mother, and he was willing to talk about the murder investigation.

The evidence supports the conclusion that Jackson "evinced a willingness and a desire for a generalized discussion about the investigation." *Oregon* v. *Bradshaw, supra,* at 1045-1046. Hence, we uphold the trial court's finding that Jackson reinitiated a police interview and that the clear exception in *Edwards,* for questioning reinitiated by a suspect, applies. Further, Jackson knowingly and intelligently waived his right to have counsel present and decided to talk freely with Newkirk. *Oregon* v. *Bradshaw, supra; State* v. *Van Hook, supra.* See, also, Annotation (1990), 101 L. Ed. 2d 1017. Since the waiver issue is factual, we defer "* * * to the judgment of the trial court that has had the benefit of hearing the evidence and assessing the weight and credibility of testimony." *Oregon* v. *Bradshaw, supra,* at 1051 (Powell, J., concurring).

## III
### Unlawful Fingerprinting

In his third proposition of law, Jackson argues that the police secured his fingerprints on September 4 through an arrest, on a pretext,

without probable cause. He argues that the finger and palm print evidence must be suppressed. The state argues probable cause for the arrest and the inevitability of discovery.

Jackson relies on *Davis* v. *Mississippi* (1969), 394 U.S. 721, and *Hayes* v. *Florida* (1985), 470 U.S. 811, which held the Fourth Amendment applicable to involuntary investigatory detention and to fingerprint evidence that police thereby unlawfully obtain.

Jackson's arguments lack merit. After arresting Jackson, police first compared his fingerprints taken in July and already on file, not prints taken after the arrest, against the murder scene latent prints. Moreover, police did not arrest Jackson on a pretext. Schafer interviewed him initially as a witness, not a suspect, and then police arrested Jackson and obtained his September fingerprints and his palm print after Jackson admitted that police would find his prints on the cash register. With that admission, and Jackson's display of knowledge about the crime, police had probable cause to arrest Jackson for tampering with evidence.

Additionally, even if the September arrest is viewed as a pretext, police inevitably would have arrested Jackson for murder and fingerprinted him. When police tentatively matched Jackson's July fingerprints with the murder scene latent prints, following his admissions, police had probable cause to arrest Jackson for murder in view of the unusual location of the toilet stall prints. As the court of appeals ruled, "the arrest and second fingerprinting were inevitable." See *Nix* v. *Williams* (1984), 467 U.S. 431.

## IV
### Opinions of Other Experts

In his fourth proposition of law, Jackson argues that the prosecutor improperly attempted to convey to the jury the hearsay opinions of two other document examiners who did not testify. The prosecutor did ask Steven Greene, a qualified documents examiner with the Ohio Bureau of Criminal Identification and Investigation, about the opinions of the other experts. However, the trial court correctly sustained defense counsel's objections. Evid. R. 801(C). Therefore, the jury did not hear the substance of those other opinions, nor were other examiners' written opinions entered into evidence.

Instead, Greene, who had testified in ninety other cases, expressed his own firm opinion that Jackson's known handwriting exemplars matched the unknown printing on the blue note pad police found at the crime scene.

Under the circumstances, no basis exists to speculate that the jury drew prejudicial inferences from questions that the trial judge ordered not to be answered. Jackson's counsel did not ask for the jury to be cautioned. No expert evidence contradicted Greene's opinion testimony; hence, Jackson suffered no prejudice from the questions. The touchstone of analysis for due process violations "* * * is the fairness of the trial, not the culpability of the prosecutor." *Smith* v. *Phillips* (1982), 455 U.S. 209, 219. The Constitution does not guarantee an error-free, perfect trial. *United States* v. *Hasting* (1983), 461 U.S. 499, 508. Jackson's claim of prejudicial error lacks merit.

## V
### Polygraph Examination

Jackson asserts in his fifth proposition of law that the trial court erroneously refused to permit Newkirk to be cross-examined about Jackson's asserted willingness to take a polygraph examination. Jackson argues that he was entitled to attack

Newkirk's credibility because Newkirk's September 7 written summary did not refer to a polygraph examination.

The subject of polygraph examinations is complex, confusing to the jury, and not relevant to the issues at trial. Even if Jackson had successfully taken a polygraph examination, the trial court could refuse to admit this evidence. *State* v. *Jamison* (1990), 49 Ohio St. 3d 182, 190, 552 N.E. 2d 180, 188. Although polygraph examination results may be admitted for corroboration or impeachment, the parties must first jointly stipulate admissibility and follow certain explicit conditions. *State* v. *Souel* (1978), 53 Ohio St. 2d 123, 7 O.O. 3d 207, 372 N.E. 2d 1318; *State* v. *Levert* (1979), 58 Ohio St. 2d 213, 12 O.O. 3d 204, 389 N.E. 2d 848. If polygraph examination results were not admissible, the trial judge had no reason to allow Jackson's asserted offer into evidence. See *State* v. *Woodruff* (1983), 10 Ohio App. 3d 326, 10 OBR 532, 462 N.E. 2d 457. Jackson's proposition of law lacks merit.

## VI

### Written Summary of Interrogation

In proposition of law six, Jackson argues error because the trial judge permitted Newkirk to read and submit to the jury his written summary of what Jackson said on September 7. The state claims admissibility and waiver. However, the record shows Jackson's counsel did object, and the trial court overruled the objection.

The trial judge's decision to allow Newkirk to read this summary to the jury and to admit it in evidence, over a defense objection, reflects error. Concededly, a witness may read a recorded recollection to the jury if he "now has insufficient recollection to enable him to testify fully and accurately." Evid.

R. 803(5). Even then, the recollection "may not itself be received as an exhibit unless offered by an adverse party." *Id.* Here, the prosecutor did not claim that Newkirk forgot, and Newkirk recalled details about the conversation. Instead, the prosecutor asked that it be read "[i]n an effort to be consistent and accurate." Yet, the natural effect of reading the statement would be to improperly bolster Newkirk's credibility.

However, we find this error harmless under the circumstances. The trial court could properly admit into evidence, as an admission, what Jackson told Newkirk. Evid. R. 801(D)(2)(a). Jackson admitted complicity in the robbery of Zak, but he tried to shift blame for the murder to an unnamed accomplice. Whether presented in the form of Newkirk's memo or Newkirk answering questions, Jackson's admissions devastated him in the eyes of the jury. The form of presentation was not crucial, and Jackson suffered no prejudice.

## VII

### Gruesome Photographs

Jackson argues in his seventh proposition of law that certain gruesome photographs were cumulative and that their prejudicial effect outweighed their probative value. The state, disputing error, contends all photographs were noncumulative and highly probative.

Under Evid. R. 403 and 611(A), admission of photographs is left to the sound discretion of the trial court. *State* v. *Landrum* (1990), 53 Ohio St. 3d 107, 121, 559 N.E. 2d 710, 726; *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 264, 15 OBR 379, 401, 473 N.E. 2d 768, 791. Nonrepetitive photographs in capital cases, even if gruesome, are admissible if relevant and probative as long as the probative

value of each photograph outweighs the danger of material prejudice to an accused. See *State* v. *Maurer, supra,* paragraph seven of the syllabus; *State* v. *Morales* (1987), 32 Ohio St. 3d 252, 257, 513 N.E. 2d 267, 273.

The coroner described the nature and extent of Zak's injuries, including the number of blows the assailant inflicted and the type of force used. The coroner's photographs illustrated his testimony. Other photos, depicting Zak's body at the scene, illustrated police testimony. All the disputed photos helped to establish the assailant's intent, an issue on which the prosecution had the burden of proof. The recurring pattern in the bruises, prominent in the photos, was highly relevant. In July, Jackson said the murderer had to get rid of his shoes because the police had footprints. At trial, Jackson claimed that he had thrown away a pair of tennis shoes in May that he had just purchased in April. Zak's injuries, resulting from crushing impacts to her neck and trunk, as if she had been stepped on, also helped to explain why Jackson's fingerprint and palm print were located so high on the toilet stall wall.

The trial judge carefully considered all offered photographs and excluded several from evidence. The photographs that he admitted, illustrative of testimony, were relevant and probative on disputed issues and not cumulative. Jackson has failed to prove that the trial judge abused his discretion. *State* v. *Morales, supra.*

## VIII
### Sufficiency of Evidence

In proposition of law eight, Jackson argues that the prosecution did not prove that the murder and robbery were related. He contends that he could have simply taken the register as an afterthought to killing Zak.

However, direct evidence of a fact is not required, and circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence. *Michalic* v. *Cleveland Tankers, Inc.* (1960), 364 U.S. 325, at 330. Intent can be proved from underlying facts and circumstances. *State* v. *Johnson* (1978), 56 Ohio St. 2d 35, 38, 10 O.O. 3d 78, 80, 381 N.E. 2d 637, 640. Even murder convictions can rest solely on circumstantial evidence. *State* v. *Nicely* (1988), 39 Ohio St. 3d 147, 150, 529 N.E. 2d 1236, 1238.

From the evidence, the jury concluded that Jackson intended to rob or had robbed Zak when he killed her. Jackson's intent is evident from his pretrial admissions and the physical evidence. Zak's purse and its contents were on the floor. Desk drawers were pulled out, evidencing ransacking. Not only was the register missing, but so were the register keys that had been pinned to Zak's smock. The robbery and murder were clearly related and the prosecution proved the death penalty specification and the robbery charge. See discussion in Part I.

## IX
### Lesser Included Offense

Jackson argues in proposition of law nine that the trial court erred in not instructing on murder as a lesser included offense. As Jackson points out, the death penalty is not constitutionally imposed if a jury cannot consider a lesser included offense reasonably raised by the evidence. *Beck* v. *Alabama* (1980), 447 U.S. 625; *Hopper* v. *Evans* (1982), 456 U.S. 605. As we have stated:

"Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an ac-

quittal on the crime charged and a conviction upon the lesser included offense. * * *'' *State* v. *Thomas* (1988), 40 Ohio St. 3d 213, 533 N.E. 2d 286, paragraph two of the syllabus.

Contrary to Jackson's claim, the evidence does not reasonably suggest that he killed Zak but did not rob her. The evidence, including his admissions, his knowledge about the register and money taken, linked Jackson to both the robbery and the murder, and his intent to rob was clearly apparent from the physical evidence. See the discussion in Parts I and VIII. The evidence does not reasonably support acquittal on the felony-murder and conviction for murder alone; hence, the evidence does not satisfy the test for a lesser included offense. *State* v. *Thomas, supra; State* v. *Tyler* (1990), 50 Ohio St. 3d 24, 36, 553 N.E. 2d 576, 591.

## X

### Other Acts as Impeachment

In proposition of law ten, Jackson claims the prosecutor improperly cross-examined Carla Elliott, a defense witness in the sentencing phase, thereby depriving Jackson of his constitutional rights. On direct examination, Carla told the jury Jackson was friendly, "the sweetest person" you could ever meet, who never struck her or anyone else and would "always walk away" from their arguments. On cross-examination, she agreed Jackson was "a peaceful, loving person," who was nonviolent. The prosecutor then asked her if she knew that Jackson had assaulted and robbed three older women in 1983 and assaulted another woman in 1985. Elliott replied that knowledge of these assaults would not change her opinion about Jackson's character.

Under Evid. R. 405(A), "inquiry is allowable into relevant specific instances of conduct," on cross-examination, to challenge the opinion of a character witness. See *State* v. *Broom* (1988), 40 Ohio St. 3d 277, 290, 533 N.E. 2d 682, 697; *State* v. *Sims* (1981), 3 Ohio App. 3d 321, 3 OBR 375, 445 N.E. 2d 235. In the sentencing phase of a capital case, the state can rebut an accused's character evidence, since R.C. 2929.04(B) requires that a defendant's history, character, and background be considered in sentencing. *State* v. *Clark* (1988), 38 Ohio St. 3d 252, 254, 527 N.E. 2d 844, 848. See, also, *State* v. *DePew* (1988), 38 Ohio St. 3d 275, 528 N.E. 2d 542. In this case, Carla's characterization of Jackson as sweet, gentle, and nonviolent opened the door for cross-examination about specific instances of conduct sharply at variance with her opinion testimony. Thus, Jackson's claim of error fails.

## XI

### Prosecution's Sentencing Argument

In proposition of law eleven, Jackson asserts that the prosecutor, by remarks in argument, prejudiced Jackson's fair trial rights. The state denies error or prejudice and argues that Jackson failed to preserve error by not objecting. See *State* v. *DeNicola* (1955), 163 Ohio St. 140, 56 O.O. 185, 126 N.E. 2d 62, paragraph three of the syllabus.

We find no manifest miscarriage of justice under the plain error rule. See Crim. R. 52(B); *State* v. *Long* (1978), 53 Ohio St. 2d 91, 7 O.O. 3d 178, 372 N.E. 2d 804, paragraph three of the syllabus. In argument, the prosecutor did improperly refer to aggravating "circumstances" although only one aggravating circumstance existed. He said he was irked by Jackson's lack of compassion and remorse. The prosecutor also asserted that the nature and circumstances of the offense were "what really warrants * * * the death penalty," but this arguably only ex-

plained why they were not mitigating. Moreover, the trial judge correctly instructed the jury on the aggravating circumstance and that only one existed. See *State* v. *Johnson* (1989), 46 Ohio St. 3d 96, 103, 545 N.E. 2d 636, 643.

According to the prosecutor, Jackson lacked courage to admit guilt, and made an unsworn statement, thereby avoiding cross-examination. The prosecutor's comment did extend beyond the guidelines for comment on unsworn statements in *State* v. *DePew, supra,* paragraph two of the syllabus. The prosecutor also said defense counsel attempted to "throw a monkey wrench or red herring" into the proceedings by transferring guilt to the jury, and was "mealy-mouthing." Although unprofessional, these comments were scarcely crucial.

Moreover, reversal cannot be premised on every intemperate remark by counsel. *State* v. *Maurer, supra,* at 267, 15 OBR at 403, 473 N.E. 2d at 793. Some latitude is granted to both parties in closing argument. *State* v. *Byrd* (1987), 32 Ohio St. 3d 79, 82, 512 N.E. 2d 611, 616. Viewed in its entirety, the closing argument did not deny Jackson a fair trial.

## XII
### Presentence Investigation

In proposition of law twelve, Jackson argues that the trial judge abused his discretion by not striking material from the presentence investigation. That report referred to pending charges of forgery, uttering, robbery, and receiving stolen property and also referred to prior arrests for attempted rape and kidnapping. Jackson does not dispute the accuracy of the report, only its relevancy.

However, we hold that the trial judge did not err. An accused who asks for a presentence investigation cannot complain of its submission to the jury. *State* v. *Esparza* (1988), 39 Ohio St. 3d 8, 10, 529 N.E. 2d 192, 195. Accurate information on pending charges can be included in a presentence investigation. *State* v. *Greer* (1988), 39 Ohio St. 3d 236, 253, 530 N.E. 2d 382, 402. Arrests are a part of an accused's social history and are properly included in a presentence investigation. *State* v. *Hutton* (1990), 53 Ohio St. 3d 36, 559 N.E. 2d 432, paragraph one of the syllabus; *State* v. *Cooey* (1989), 46 Ohio St. 3d 20, 35, 544 N.E. 2d 895, 914. See, also, *State* v. *Greer, supra,* paragraph four of the syllabus.

## XIII
### Sentencing Instructions

In his thirteenth proposition of law, Jackson asserts that the trial court improperly instructed the jury to exclude consideration of sympathy, thereby violating his constitutional rights. However, we have rejected similar arguments. *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 15 OBR 311, 473 N.E. 2d 264, paragraph three of the syllabus; *State* v. *Landrum, supra,* at 123, 559 N.E. 2d at 728. See, also, *California* v. *Brown* (1987), 479 U.S. 538; *Saffle* v. *Parks* (1990), 494 U.S. ___, 108 L. Ed. 2d 415, 110 S. Ct. 1257.

In proposition of law fourteen, Jackson contends that the trial judge erred when he instructed the jury that its recommendation was not binding, citing *Caldwell* v. *Mississippi* (1985), 472 U.S. 320. However, to establish a violation of the rule in *Caldwell,* a defendant must show that the jury instructions were inaccurate. *Dugger* v. *Adams* (1989), 489 U.S. 401. The instruction given was accurate, and the trial judge did not commit prejudicial error. *State* v. *Jenkins, supra,* paragraph six of the syllabus; *State* v.

*Hicks* (1989), 43 Ohio St. 3d 72, 79-80, 538 N.E. 2d 1030, 1038-1039.

In proposition of law sixteen, Jackson argues that the trial court erred because it did not instruct on residual doubt in the penalty phase. Jackson contends that the jury could not have understood the significance of Myrieckes' testimony without this instruction. See our discussion in Part I. In response, the state argues waiver.

Jackson correctly argues that the trial jury may consider residual doubt in deciding a death penalty case. *State v. Gillard* (1988), 40 Ohio St. 3d 226, 234, 533 N.E. 2d 272, 281; *State v. Buell* (1986), 22 Ohio St. 3d 124, 142, 22 OBR 203, 218-219, 489 N.E. 2d 795, 811. However, Jackson waived any instructional deficiency by not requesting such an instruction or objecting to its absence. Failing to object to a jury instruction waives any error "unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood* (1983), 3 Ohio St. 3d 12, 3 OBR 360, 444 N.E. 2d 1332, syllabus. See, also, Crim. R. 52(B); *State v. Long, supra; State v. Williams* (1977), 51 Ohio St. 2d 112, 5 O.O. 3d 98, 364 N.E. 2d 1364, paragraph one of the syllabus. Jackson's failure to raise the issue at the court of appeals also waived all but plain error. See *State v. Williams, supra,* paragraph two of the syllabus.

Here, no miscarriage of justice, plain error, or material prejudice resulted from the trial judge's failure to instruct on residual doubt. Even with such an instruction, the outcome of the trial would not have been clearly different. *State v. Underwood, supra.* The jury could readily reconcile Myrieckes' testimony with Jackson's guilt. See the discussion in Part I. Moreover, in an unsworn mitigation statement, Jackson continued to profess innocence; hence the possible significance of Myrieckes' testimony was not lost on the jury. Instead, the jury by their recommendation of death continued to reject Jackson's alibi defense and pleas of innocence.

## XIV
### Constitutionality

In his fifteenth proposition of law, Jackson challenges the constitutionality of Ohio's felony-murder statute, asserting overbreadth and duplication between the aggravating circumstances and the death penalty specifications. However, similar statutory schemes have been held to constitutionally narrow the class of persons eligible for the death penalty. See *Lowenfield v. Phelps* (1988), 484 U.S. 231. Moreover, we have previously rejected these arguments. See *State v. Jenkins, supra; State v. Henderson* (1988), 39 Ohio St. 3d 24, 528 N.E. 2d 1237, paragraph two of the syllabus.

In proposition of law seventeen, Jackson launches a multifaceted attack against the constitutionality of Ohio's death penalty statutes. We have previously rejected these arguments. See *State v. Scott* (1986), 26 Ohio St. 3d 92, 109, 26 OBR 79, 93-94, 497 N.E. 2d 55, 69; *State v. Jenkins, supra,* paragraph eight of the syllabus; *State v. Poindexter* (1988), 36 Ohio St. 3d 1, 520 N.E. 2d 568.

## XV
### Sentencing

At the sentencing hearing, Jackson presented little evidence and relied principally upon residual doubt. His girlfriend, Carla Elliott, testified that he was a sweet, loving person who never abused her or anyone else. Yet Carla's opinion never faltered when she heard Jackson previously had assaulted four women. Myrieckes' testimony could be reconciled with Jackson's guilt.

In an unsworn statement, Jackson said little about his background. Although he continued to assert his innocence, Jackson stated that he was not angry with the jury. He said he hoped and prayed the police ultimately would find the persons responsible for this crime. He did object to Newkirk's testimony on the ground that he never told Newkirk the things that Newkirk said he had. Jackson said he felt sorry for the victim, her family, and his own family, including Carla, who was going to have his baby. He said he would do the best he could in prison.

The presentence investigation revealed Jackson, a high school graduate in good health, was born in Florida on March 9, 1966. His parents divorced eleven years later. At age twelve, he was adjudged unruly by a juvenile court. The juvenile court committed him at seventeen to the Department of Youth Services for aggravated robbery and carrying a concealed weapon. At nineteen, he was sentenced to a reformatory for possession of criminal tools, gross sexual imposition, and attempted grand theft of a motor vehicle. Pending charges, noted earlier, involved forgery and receiving stolen property. Jackson denied use of drugs or excessive alcohol. When arrested in September 1987, he worked in a restaurant.

We find the evidence fully supports the single aggravating circumstance that Jackson, as a principal offender or with prior calculation and design, purposefully killed Zak during an aggravated robbery. In contrast with the proved aggravating circumstance, the trial court and court of appeals found no mitigating factors.

After independently assessing the evidence, the only evident mitigating factor is Jackson's age of twenty-one at the time of the offense. We find nothing in the nature and cir-

cumstances of the offense to be mitigating. Zak suffered being beaten to death, with multiple fractures, and then Jackson ignominiously stuffed her head into a toilet. Jackson's history, character, and background offer nothing in mitigation aside from his age. Carla Elliott's testimony was of little value. Jackson chose to tell the jury very little about himself; and what we know from the presentence investigation does not suggest extenuation.

Under R.C. 2929.04(B), the statutory mitigating factors offer little assistance to Jackson. No evidence shows Zak induced the offense, R.C. 2929.04(B)(1), or that Jackson acted under "duress, coercion, or strong provocation," R.C. 2929.04(B)(2). The psychiatric report failed to suggest any mental disease or defect, R.C. 2929.04(B)(3). The specified factor, "youth of the offender," R.C. 2929.04(B)(4), applies and we give it some weight. Jackson's prior record, reflected in the presentence investigation, negates applying R.C. 2929.04 (B)(5). Jackson did say on September 7, in talking with Police Captain Newkirk, that someone else involved in the robbery killed Zak. However, our view of the evidence negates applying R.C. 2929.04(B)(6). At trial, Jackson and his counsel relied on residual doubt as their principal mitigating factor. Although residual doubt does qualify as a significant "other factor," we choose to give it no weight under the circumstances of this case. See R.C. 2929.04(B)(7); *State* v. *Apanovitch* (1987), 33 Ohio St. 3d 19, 29, 514 N.E. 2d 394, 405 (H. Brown, J., separate opinion).

We conclude, after independently weighing the proved aggravating circumstance against mitigating factors, that the aggravating circumstance

outweighs mitigation beyond a reasonable doubt. Further, we conclude that death is an appropriate and proportionate penalty when this case is compared with other robbery-murder cases. See *State* v. *Lott* (1990), 51 Ohio St. 3d 160, 555 N.E. 2d 293; *State* v. *Jamison, supra; State* v. *Van Hook, supra; State* v. *Greer, supra.*

Accordingly, appellant's convictions and sentence of death are affirmed.

*Judgment affirmed.*

SWEENEY, HOLMES, DOUGLAS, WRIGHT, H. BROWN and RESNICK, JJ., concur.